[Cite as *In re K.C.*, 2025-Ohio-114.]

COURT OF APPEALS
ASHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN RE: K.C. & R.C.

JUDGES:
Hon. William B. Hoffman, P.J.
Hon. Craig R. Baldwin, J.
Hon. Andrew J. King, J.

Case Nos. 24-COA-014 & 24-COA-015

O P I N I O N

CHARACTER OF PROCEEDINGS:     Appeal from the Ashland County Court of
                              Common Pleas, Juvenile Division, Case
                              Nos. 2018-0365 & 2018-0366

JUDGMENT:                     Affirmed

DATE OF JUDGMENT ENTRY:       January 15, 2025

APPEARANCES:

For Appellee                          For Appellant

CHRISTOPHER R. TUNNELL                BRIAN A. SMITH
Ashland County Prosecuting Attorney   Brian A. Smith Law Firm, LLC
                                      123 South Miller Road, Suite 250
JOSHUA T. ASPIN                       Fairlawn, Ohio 44333
Assistant Prosecuting Attorney
110 Cottage Street, Third Floor
Ashland, Ohio 44805

*Hoffman, J.*

**{¶1}**   In Ashland App. Nos. 24-COA-014 and 24-COA-015, Appellant P.A. ("Mother") appeals the March 25, 2024 Decision and Judgment Order entered by the Ashland County Court of Common Pleas, Juvenile Division, which terminated her parental rights with respect to her two minor children ("Child 1" and "Child 2," individually; "the Children," collectively) and granted permanent custody of the Children to appellee Ashland County Department of Job and Family Services ("ACJFS").[1]

STATEMENT OF THE FACTS AND CASE

**{¶2}**   Mother and T.C. ("Father") are the biological parents of the Children (We will refer to Mother and Father collectively as "Parents").[2]  On December 11, 2018, ACJFS filed two complaints, alleging Child 1 and Child 2, respectively, were neglected and dependent. ACJFS filed the complaints after law enforcement executed a search warrant at Parents' home on December 10, 2018, and discovered drugs and drug paraphernalia in the residence.  Mother admitted to recent illegal drug use and had drug paraphernalia on her person.  Parents were arrested and the Children were removed.

**{¶3}**   The trial court conducted a shelter care hearing on December 11, 2018, and placed the Children in the temporary custody of ACJFS. The trial court appointed Attorney Christina Reiheld as Guardian ad Litem ("GAL") for the Children.  The trial court subsequently permitted Attorney Reiheld to withdraw as she had taken a new job. Attorney Shantell George was appointed as GAL.

**{¶4}**   Father was initially charged in a nine (9) count Indictment. He subsequently plead guilty to four (4) counts, to wit: aggravated trafficking, trafficking, weapons under

---

[1] ACJFS has not filed a brief or otherwise appear in this appeal.
[2] Father is not a party to this appeal.

disability, and child endangering. The trial court sentenced Father to a period of incarceration of 42 months. Father was released in August, 2022. Mother was charged as a co-defendant in the same Indictment. Mother plead guilty to three counts, to wit: complicity to aggravated trafficking, complicity to trafficking, and child endangering. On August 20, 2019, Mother was sentenced to 120 days house arrest, which ended on December 19, 2019.

{¶5} Following an adjudicatory hearing on February 14, 2019, the trial court found the Children to be neglected and dependent. The first case plan, which was filed on February 21, 2019, required Mother to engage in mental health and substance abuse services and complete a parenting education program. The trial court conducted a dispositional hearing on March 13, 2019, and ordered the Children be placed in the temporary custody of ACJFS

{¶6} Mother was arrested for violating her community control on December 3, 2019. Specifically, Mother contacted Father without the permission of her probation officer, which was prohibited by the terms of her community control. The trial court conducted a review hearing on December 5, 2019, and maintained the status quo. The case plan was updated on December 5, 2019, and again on December 13, 2019. On January 13, 2020, Mother was sentenced to a term of incarceration of 30 months resulting from the violations of the terms of her community control.

{¶7} On April 24, 2020, ACJFS filed a motion to modify disposition, requesting the Children be placed in the legal custody of Mother's sister ("Aunt") and her husband ("Uncle"). The trial court originally scheduled the hearing on ACJFS's motion to modify disposition for October 29, 2020, but continued the matter twice upon Mother's request.

Mother was placed on judicial release on November 3, 2020. Mother made some progress on her case plan, including parenting education and substance abuse services.

{¶8} The magistrate conducted a hearing on ACJFS's motion to modify disposition on May 5, 2021. Via Decision filed July 2, 2021, the magistrate granted ACJFS's motion and ordered the Children be placed in the legal custody of Aunt and Uncle. Mother filed timely objections to the magistrate's decision. Before the trial court could rule on Mother's objections, Aunt and Uncle decided they were no longer willing to accept legal custody of the Children. Despite this decision, Aunt and Uncle consented to the Children remaining in their home until the trial court issued a new order. On March 16, 2022, Mother filed a notice informing the trial court of the change of circumstances relevant to the trial court's decision on ACJFS's motion to modify disposition. The trial court scheduled a hearing for May 3, 2022, in response to Mother's notice. On March 17, 2022, the trial court permitted the GAL to withdraw due to Attorney George's relocation.

{¶9} Mother filed a motion for reunification on May 3, 2022. The magistrate conducted the hearing on Mother's notice of change of circumstances as scheduled on May 3, 2022. Following the hearing, the magistrate filed an amended decision and judgment entry on May 6, 2022, and ordered the Children remain in the temporary custody of ACJFS. The magistrate also granted Mother visitation. Mother was advised by the caseworker it was likely ACJFS would move for permanent custody if she went back to prison. Mother's judicial release was revoked on June 23, 2022, due to unauthorized contact with Father. Mother was ordered to serve the approximate 15-month balance of her 30-month sentence.

{¶10} Via Order filed July 5, 2022, the trial court instructed ACJFS to file an alternative permanency motion on or before July 8, 2022. ACJFS filed a motion for permanent custody on July 7, 2022. On August 15, 2022, Michael "Mick" McPherran, Mother's grandfather, filed a motion to intervene, which the trial court granted. McPherran filed a motion for legal custody of the Children the following day, August 16, 2022. On August 24, 2022, ACJFS filed a motion to continue the permanent custody hearing and motion to appoint a new GAL. The trial court appointed Attorney David Hunter as the new GAL, but Attorney M. Lore' Whitney was subsequently appointed.

{¶11} Mother was released from prison on October 6, 2022. The case plan was updated on October 8, 2022, and provided for visitation between Mother and the Children. Mother objected and proposed a case plan with expanded visitation. Mother did, however, re-engage in some case plan services. Mother filed a motion for reunification and a motion for temporary orders on November 10, 2022. Although Mother tested positive for cocaine on November 28, 2022, she denied any drug use.

{¶12} Sometime in November or December, 2022, ACJFS placed the Children with McPherran. However, ACJFS filed an emergency case plan on May 16, 2023, after it was alleged the Children had been touched inappropriately while in McPherran's care. In addition, ACJFS learned McPherran was allowing Mother to have unsupervised access to the Children. The Children were removed from McPherran's home and placed in foster care. Police closed the investigation into the allegations against McPherran after finding the allegations were unsubstantiated.

{¶13} On February 13, 2024, Mother appeared in the United States District Court for the Northern District of Ohio and pled guilty one count of felon in possession of

ammunition, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(8); and one count of transfer of ammunition to a felon, in violation of 18 U.S.C. §922(d)(1) and 924(a)(8), in the matter of *United States of America v. Paige R. Acker*, Case No.: 1:23-CR-00199-DAP(3). Father was indicted separately based upon the same underlying activity. Mother was placed on community control and ordered to pay restitution.

{¶14} The trial court conducted a hearing on the motion for permanent custody as well as a number of pending motions over the course of several days.

{¶15} Heidi Glass, the ongoing caseworker assigned to the family, provided a comprehensive history of Mother's involvement with the criminal justice system during the pendency of the matter. Mother continually had contact with Father despite repeatedly being instructed not to do so. Glass met with Mother in June, 2022, prior to Mother being sentenced yet again on violations of her community control. Glass informed Mother ACJFS would move for permanent custody if she was reincarcerated. When Mother was released from prison on October 6, 2022, she immediately met with Glass and Glass' supervisor. Mother agreed to complete new substance use disorder and mental health assessments as well as parenting education. Mother tested positive for cocaine on November 28, 2022, and positive for methamphetamine, amphetamine, and cocaine on August 30, 2022. Mother had participated in the parent education program at Ashland Parenting Plus in 2019, but had not re-engaged since her release from prison.

{¶16} Aunt testified the Children were placed in her home following their initial removal from Parents' home. Neither Child 1 nor Child 2 has special needs. Child 1 was in first grade. Child 1 was receiving extra help with reading and writing, but otherwise was doing well. Child 2 was enrolled in a Headstart preschool program. Child 2 was doing

well and not having any issues. Prior to Mother returning to prison in June, 2022, Mother was spending every weekend with the Children. Mother had supervised visits with the Children following her release from prison in October, 2022.

**{¶17}** The Children are bonded with one another. Aunt described the two as inseparable. Aunt explained she and Uncle were no longer willing to be legal custodians for the Children due to the "never ending" drama in the family. Aunt noted the Children's behavior changed when they spent time with Mother. The Children became disrespectful and acted out. The Children began quarrelling with each other. Child 2 became destructive, taking joy in breaking things and deliberately engaging in behavior which was not permitted. Aunt thought it would be difficult for McPherran to care for the children on a full-time basis. Aunt believed the Children should be placed together. Aunt added she felt it was in the Children's best interest to live with a family not associated with Mother's family.

**{¶18}** Ashland Police Detective Brad Scarl testified, at approximately 11:00 a.m. on Friday, April 28, 2023, he and Detective Cantor stopped for fuel at a BP Station in downtown Ashland on their way to a follow-up investigation. While Detective Scarl was pumping gas, he observed Mother drive her vehicle into the station and park at an adjacent fuel pump. Detective Scarl was familiar with Mother's passenger, Cody Lawrence, through other investigations. Lawrence was wanted on an active warrant. Detective Scarl called for backup. Officers arrested Lawrence following a brief chase. Lawrence was subsequently charged with illegal conveyance and possession of cocaine. As part of the investigation, Detective Scarl recovered text messages between Lawrence and Mother, which revealed Mother was trading her Suboxone strips for drugs.

{¶19} Heidi Glass learned of Lawrence's arrest from Mother's vehicle on May 9, 2023. After ACJFS learned about the text messages, the Agency decided to move the Children from McPherran's home because the Children were in a potentially dangerous environment. Glass added ACJFS learned the Children were in the vehicle on the day of Lawrence's arrest. Glass contacted Child 1's school and was informed McPherran called Child 1 off due to illness. Child 2 did not have preschool that day. Glass determined McPherran was allowing Mother to have significant, unsupervised time with the Children.

{¶20} Mother testified on her own behalf, and claimed the whole case centered around concerns about Father and her being around Father. Mother denied having any contact with Father since April, 2023. Mother stated she would "fight tooth and nail" for the Children. Mother downplayed her relationship with Cody Lawrence. With regard to the federal case, Mother believed she would be placed on house arrest, followed by three (3) years probation. Mother had no concerns about McPherran's ability to properly care and nurture the Children.

{¶21} On cross-examination, Mother claimed she ended her relationship with Lawrence after he was arrested. Mother was pregnant at the October 12, 2023 hearing, but did not know who the father of the child was. Mother stated it was either Father or an individual named Montell Taylor. Mother denied trading her Suboxone to Father in exchange for narcotics. Mother could not recall sending text messages to Lawrence revealing that fact. She claimed she was taking her Suboxone as prescribed, but could not explain why her drug screens were not positive for it.

{¶22} McPherran testified on his own behalf. He lives by himself in a three (3) bedroom home. The Children share a room when they stay with him. McPherran is a

retired Ashland City firefighter and was honorably discharged from the Navy. He is physically active, working out at the YMCA and clearing and cleaning trails with a trail club. McPherran stated he was in good health, drank a beer on occasion, did not use illegal drugs, and had no criminal history. McPherran raised Mother, Aunt, and their younger sibling for seven (7) or eight (8) years when they were children. He believed he would be able to prioritize the needs of the Children over Mother's desires. McPherran added permanent custody was not in the Children's best interest as ACJFS could not guarantee the Children would remain together and the Children should not be separated from family.

**{¶23}** On cross-examination, McPherran indicated Mother lives in a home he owns. McPherran advised Mother Father was not permitted to stay in the home. McPherran believed he was able to handle the Children's behavior, especially Child 2 whom he described as "a pistol."

**{¶24}** Via Decision and Judgment Order filed March 25, 2024, the trial court terminated Mother's parental rights and granted permanent custody of the Children to ACJFS. The trial court found the Children had been in the temporary custody of ACJFS for 12 or more consecutive months of a consecutive 22-month period and the Children could not or should not be placed with Mother within a reasonable time. The trial court further found it was in the best interest of the Children to grant permanent custody to ACJFS.

**{¶25}** It is from this judgment entry Mother appeals. In Ashland App. Nos. 24-COA-014 and 24-COA-015, Mother raises the following identical assignments of error:

I. THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO APPELLEE, ASHLAND COUNTY JOB AND FAMILY SERVICES, SINCE APPELLEE FAILED TO DEMONSTRATE, BY CLEAR AND CONVINCING EVIDENCE, THAT GROUNDS EXISTED FOR PERMANENT CUSTODY, AND SINCE THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II. THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO APPELLEE, ASHLAND COUNTY JOB AND FAMILY SERVICES, SINCE APPELLEE FAILED TO DEMONSTRATE, BY CLEAR AND CONVINCING EVIDENCE, THAT GROUNDS EXISTED FOR PERMANENT CUSTODY, AND SINCE THE TRIAL COURT'S DECISION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

III. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO APPELLEE, ASHLAND COUNTY JOB AND FAMILY SERVICES, BECAUSE THERE WAS NOT COMPETENT, CREDIBLE EVIDENCE THAT APPELLEE MADE "REASONABLE EFFORTS" TO REUNIFY THE FAMILY.

**{¶26}** These cases come to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

I, II

**{¶27}** For ease of discussion, we shall address Mother's first and second assignments of error together.

**{¶28}** As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. (Citation omitted.) *In re D.R.*, 2024-Ohio-1819, ¶28 (5th Dist.). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.*, 54 Ohio St.2d 279, syllabus (1978).

**{¶29}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long term foster care.

**{¶30}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶31} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d)is present before proceeding to a determination regarding the best interest of the child.

{¶32} If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶33} As set forth in our Statement of the Facts and Case, supra, we find there was sufficient and substantial competent evidence Mother failed to remedy the problems which initially caused the removal of the Children from Parents' home, and the Children cannot or should not be placed with Parents in a reasonable time. Mother had periods of compliance with her case plan, however, her work on the case plan was repeatedly disrupted for significant periods of time due to her incarcerations.

{¶34} The Children had not lived with Mother in over five (5) years. Mother denied any current involvement with Father despite their lengthy history together. Twice during the pendency of this matter, Mother was incarcerated for having contact with Father although she was prohibited from doing so. Mother was involved with two (2) other men

in the five (5) years the matter was pending. Both men had extensive criminal histories which included drug abuse.

{¶35} Although Mother participated in parenting education, the parenting instructor opined Mother just went through the motions and did not benefit from the program. Mother also participated in substance abuse services at Ashland County Council on Alcoholism and Drug Abuse. She was diagnosed with anxiety, depression and post-traumatic stress disorder, but only minimally addressed those mental health issues. Mother was pregnant with her fourth child at the time of the final hearing. Mother did not know who the father of the baby was. Her oldest child was born when Mother was 14-years old. Mother lost custody of that child.

{¶36} The trial court also found, pursuant to R.C. 2151.414(B)(1)(d), the Children had been in the temporary custody of SCJFS for a period of time in excess of twelve of the prior twenty-two consecutive months. The 12 of 22 finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun,* 2008-Ohio-5458, ¶ 45 (5th Dist.).

{¶37} Mother further asserts ACJFS did not meet its burden, by clear and convincing evidence, to demonstrate permanent custody was in the best interest of the Children, and the trial court's best interest finding was against the manifest weight of the evidence.

{¶38} We review a trial court's best interest determination under R.C. 2151.414(D) for an abuse-of-discretion. *In re D.A.,* 2010-Ohio-5618, ¶ 47 (8th Dist.). A trial court's failure to base its decision in consideration of the best interest of the child constitutes an abuse-of-discretion. *In re R.S.,* 2022-Ohio-4387, ¶ 45 (8th Dist.), quoting *In re N.B.,* 2015-

Ohio-314, at ¶ 60 (8th Dist.). "The term 'abuse-of-discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶39}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (b) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in division (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

**{¶40}** In its March 25, 2024 Decision and Judgment Order, the trial court considered the statutory factors set forth in R.C. 2151.414(D) and concluded granting permanent custody to ACJFS was in the best interest of the Children. The trial court specifically found the Children have always lived together and are bonded to one another; therefore, should remain together wherever they go.

**{¶41}** Aunt and Uncle provided care from the Children for approximately four (4) years, commencing when the Children were initially removed from Parents' home in December, 2018. Aunt and Uncle loved the Children, but had to make the difficult decision not to accept legal custody. Aunt cited the never-ending drama within the family as well as the chaos caused by and bad decisions made by Mother and other member of

the family.   Aunt noted the Children's' behaviors always changed for the worse after spending time with Mother. The Children became disrespectful and disobedient. Aunt and Uncle recognized if they accepted legal custody, Mother and the family would remain involved which Aunt and Uncle saw as detrimental to the Children.   Aunt reluctantly concluded it was in the best interests of the Children to be away from Mother and the family.

{¶42}  Aunt believed McPherran could probably care for the Children, if he, in fact, did so. Aunt was concerned McPherran, as he had historically done, would allow Mother and her mother, who has significant mental health issues, to participate and care for the Children.

{¶43}  Mother's poor choices resulted in repeated incarcerations, which had a direct negative and detrimental impact on the Children. During her incarcerations, Mother was unable to visit with, care for, or provide for the Children.

{¶44}  Based upon the foregoing, we find the trial court's finding the Children could not and should not be placed with Mother in a reasonable time was supported by competent, credible evidence and was not against the manifest weight of the evidence. We further find the trial court's finding it was in the Children's best interest to grant permanent custody to ACJFS was not against the manifest weight of the evidence.

{¶45}  Mother's first and second assignments of error are overruled.

III

{¶46} In her third assignment of error, Mother argues the trial court erred in granting permanent custody to ACJFS because the Agency failed to make reasonable efforts to reunify Mother and the Children. Specifically, Mother contends ACJFS's failure

to provide Mother with sufficient parenting time created "a substantial obstacle to reunification." Brief of Appellant at p. 27. We disagree.

**{¶47}** The Ohio Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419. "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." (Citation omitted.) *In re Z.G.A.A.*, 2024-Ohio-326, ¶ 48 (5th Dist.). To that, case plans establish individualized concerns and goals, along with the steps the parties and the agency can take to achieve reunification. (Citation omitted.) *Id.*

**{¶48}** R.C. Chapter 2151 does not define "reasonable efforts," but the term has been construed to mean "[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed." (Citation omitted.) *In re C.F.*, 2007-Ohio-1104, ¶ 28. "Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification." (Citation and internal quotations omitted.) *In re H.M.K.*, 2013-Ohio-4317, ¶ 95 (3rd Dist.).

**{¶49}** What constitutes "reasonable efforts" requires consideration of the nature of a case plan and varies with the circumstances. *In re S.M.*, 2015-Ohio-2318, ¶ 31 (12th Dist.). "In determining whether the agency made reasonable efforts [pursuant to R.C. 2151.419(A)(1)] to prevent the removal of the child from the home, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re Lewis*, 2003-Ohio-5262, ¶ 16 (4th Dist.).

" 'Reasonable efforts' does not mean all available efforts." *Id.* A "reasonable effort" is "* * * an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." *In re Weaver*, 79 Ohio App.3d 59, 63 (12th Dist. 1992).

**{¶50}** As stated, supra, the issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. We find ACJFS's case planning and efforts were reasonable and diligent under the circumstances of this case. ACJFS had been involved with the family since 2018. Throughout this time, Mother was repeatedly incarcerated. Each time she was released, ACJFS reinstated visitation. Mother's visits were not expanded through no fault but her own. She chose to make bad decisions over and over.

**{¶51}** Upon review of the entire record, we find the trial court did not err in concluding ACJFS made reasonable efforts to reunite Mother with the Children.

**{¶52}** Mother's third assignment of error is overruled.

**{¶53}** The judgment of the Ashland County Court of Common Pleas, Juvenile Division, is affirmed.

By: Hoffman, P.J.

Baldwin, J.  and

King, J. concur